IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

SANDRA BROWN-BAUMBACH     :
                                    :           CIVIL ACTION
             v.                      :
                                      :           NO. 09-3962
B & B AUTOMOTIVE, INC.        :

**SURRICK, J.**                                               **JULY <u>6</u> , 2010**

<u>**MEMORANDUM**</u>

Presently before the Court is Defendant B&B Automotive, Inc.'s Motion for Summary Judgment.  (Doc. No. 23.)  For the following reasons, the Motion will be granted.

## I.     BACKGROUND

Plaintiff Sandra Brown-Baumbach began working for B&B Automotive on May 5, 2008. (Doc. No. 24 Ex. A at 8 [hereinafter Pl.'s Dep.].)  Approximately four months later, she terminated her employment with B&B Automotive and filed a complaint with the Equal Opportunity Employment Commission.  After receiving a right to sue letter, Plaintiff filed the instant Complaint, alleging one count entitled "Sexual Harassment/Gender Discrimination" and one count entitled "Retaliation," both under Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e *et seq.*  (Compl. ¶¶ 63-69.)  In discussing the background of the case, we will review the facts in a light most favorable to Plaintiff as the nonmoving party and resolve all factual disputes in her favor.  *See Aman v. Cort Furniture Rental Corp.*, 85 F.3d 1074, 1077 n.1 (3d Cir. 1996) ("We resolve all factual doubts and draw all reasonable inferences in favor of [the plaintiffs], the nonmoving parties."  (citing *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986))).

B&B Automotive is a car lot. Plaintiff was hired as an assistant business manager responsible for loan financing. (*See* Pl.'s Dep. at 10-11.) She started working at a salary of five hundred dollars a week plus a twenty-five dollar commission for every contract that she completed. (*Id.* at 8-9.) Two weeks after she started, she was promoted, and her salary was increased to six hundred dollars a week plus a thirty-five dollars commission for every contract she completed. (*Id.* at 11.) The owner of B&B Automotive, Michael Brill, was Plaintiff's boss. He hired Plaintiff and reviewed her work. (*Id.* at 12.) Plaintiff was also supervised by Frank Beyer, who was responsible for training her. (*See id.* at 84.) In addition to Brill and Beyer, Plaintiff's job responsibilities required her to interact regularly with several other employees.

Plaintiff complains that over the four months she worked at B&B Automotive she was subjected to humiliating, degrading, and discriminatory conduct. The conduct can be grouped into three categories: (1) sexual comments, jokes, rumors, and innuendo; (2) gender-based discrimination or animus; and (3) retaliation. The sexual comments, jokes, rumors, and innuendo began shortly after Plaintiff started her employment. During Plaintiff's first week, she witnessed a B&B Automotive employee, Larry Knorr, tell a female customer that he would like to take her dancing. Knorr stated to the customer, "Don't worry, I swing both ways." (*Id.* at 58.) The customer ignored the comment. Plaintiff thought the customer seemed uncomfortable. (*Id.* at 60-61.) The incident offended Plaintiff, and she reported it to Brill. He fired Knorr, who had a history of making inappropriate comments. (*Id.* at 62-63.) As a result of Knorr being fired, Plaintiff was promoted. (*Id.* at 62.)

Some time later, Plaintiff and another employee, Joe Nasito, became the subject of a workplace rumor that they were sleeping together. (*See id.* at 94-110.) Plaintiff firmly denies

that she and Nasito had a romantic relationship and maintains that they were just friends. (*Id.* at 100.) Plaintiff drove Nasito to work and they sometimes had lunch together. (*Id.*) They often discussed the relationship problems that Plaintiff was experiencing in her marriage and the problems that Nasito was experiencing with his ex-wife. (*Id.* at 101.) One day at lunch, Nasito attempted to kiss Plaintiff in public. Plaintiff did not reciprocate and later informed her husband of what had happened. (*See id.*) Plaintiff and Nasito also saw each other outside of work. On one occasion, Plaintiff picked Nasito up at a bar after work because he was too drunk to drive home. On another occasion, Nasito accompanied Plaintiff and friends to a tanning salon. (*Id.* at 104, 106.) It is unclear whether any B&B Automotive employees were aware of Plaintiff and Nasito's contact outside of work.

Plaintiff recalls that she first became aware of the rumor that she and Nasito were sleeping together when she "could hear people talking, snickering, laughing" about her and Nasito. (*See id.* at 93.) Nasito's supervisor directly addressed the rumor with Plaintiff, advising Plaintiff to "watch who [she] trust[ed], because people that [she] trust[ed] in the company . . . spread rumors, and it could . . . affect [her] employment . . . ." (*Id.* at 94-97.) Nasito's supervisor told Plaintiff that Brill would not put up with "nonsense," by which she meant rumors going around. (*Id.* at 97.) Plaintiff reported this problem to Beyer, who told her that if she ignored the rumor, it would go away. (*Id.*) Not satisfied with Beyer's response, Plaintiff complained directly to Brill, who responded to the complaint by becoming angry. He told Plaintiff that perception was everything, and he explained to her that he would be concerned about what people thought of his daughter if she were driving a man back and forth from work. (*See id.* at 99.) Brill also told Plaintiff that if she wanted to "continue working for a Brill, [she] need[ed] to learn to be strong enough to work for a Brill." (*Id.*) He concluded by telling Plaintiff that he did not have time to deal with this

"fucking nonsense," to "grow up and not be a crybaby," and to "get the fuck out of his office." (*See* Compl. ¶¶ 25-26; Pl.'s Dep. at 51, 99, 112, 188.) Plaintiff went back to work, and did not raise the issue again.

In July 2008, Plaintiff was involved in another unrelated incident in which she became the butt of a joke. It was a warm summer day and everyone in the office agreed to take a break for ice cream. As the most junior person in the office, Plaintiff was chosen to go to the store. (Pl.'s Dep. at 116-17.) Another employee, an elderly man named Charlie who was a sort of office factotum, was chosen to drive Plaintiff to the store because Plaintiff could not carry all the ice cream by herself. (*Id.* at 115.) Plaintiff and Charlie drove to the store and Plaintiff purchased ice cream for her coworkers. After she got back into the car, Charlie pulled out of the store's parking lot quickly, causing Plaintiff to spill ice cream on her dress. (*Id.* at 118.) Charlie thought the spill was funny and laughed all the way back to the car lot. (*Id.*) When they arrived, Plaintiff apologized about the spilled ice cream to her coworkers and went to the bathroom to clean herself off. (*Id.* at 120.) As Plaintiff was making her way to the bathroom, Charlie cracked a joke that "he made [Plaintiff] so excited that he creamed [her] pants." (*Id.* at 119; *see also* Compl. ¶ 32.) Plaintiff did not hear whether the joke elicited any response from her coworkers. (*See* Pl.'s Dep. at 120.) No supervisors were present when the joke was told, and Plaintiff was permitted to go home and change her clothes. (*See id.* at 119-20.)

Plaintiff was subjected to sexual conversation or innuendo on several other occasions. On another day in July, all the B&B Automotive employees gathered at a diner for an employee meeting. (*Id.* 126-27.) During the meeting, Beyer's secretary was instructed to screen Beyer's calls so he could focus on his work. The secretary replied, "So I have permission to tell [Beyer's] wife that [he] is getting busy or he's too busy to have to call her because he and [Plaintiff] are

4

behind closed doors." (*Id.* at 127.) All the employees who were present heard the comment. Plaintiff later complained of the comment to Beyer, who told her to "ignore the cattiness that was going on in the office." (*See id.*) Beyer himself also engaged in activity that Plaintiff found inappropriate and offensive. One day, he sent Tim Martin, the manager of B&B Automotive's second location, a text message asking, "Is [Plaintiff] wearing underwear?" (*Id.* at 131.) Martin showed the message to Plaintiff, and used it to try to convince her to come to work at his location. (*Id.* at 132.) He told her that his location was "very quiet and calm" and that he needed "an attractive woman" there to help close deals. (*Id.*) On another occasion, when Plaintiff's cousin was looking for work, Tim Martin told Plaintiff that if her cousin "was attractive and wore heels, she would automatically get hired." (*Id.* at 136.) One day when Plaintiff and Beyer were working together, a customer who was an exotic dancer came into the store. (*See id.* at 138-40.) When the woman walked in, Beyer said to Plaintiff, "Heels really turn me on. What do you think she has in the trunk?" (*Id.* at 139.) The customer, who was unaware of the comment, purchased a car, and Beyer helped her move her belongings from her old car to her new car. (*See id.*) As he was moving the customer's "stripper heels," he showed them to Plaintiff and said, "look, these are what turn me on." (*Id.*)

Not all of the conduct that Plaintiff found objectionable was sexual in nature. During Plaintiff's second or third week on the job, a coworker informed her of a rumor that one of their colleagues, Theresa Martin, disliked working with other women and that she had a tendency to get women fired. (*Id.* at 63; *see also* Compl. ¶¶ 19-20.) Theresa Martin handled the title work at B&B Automotive, and Plaintiff had to interact with her periodically. (Pl.'s Dep. at 65.) If Plaintiff made a mistake in her paperwork, Theresa Martin would throw the papers on the floor, ignore Plaintiff, and fix the mistakes after Plaintiff was gone. (*Id.* at 66-67.) According to

Plaintiff, Theresa Martin treated the other female B&B Automotive employees in the same way. (*Id.* at 68.) Plaintiff believes that Theresa Martin started the rumor about Plaintiff sleeping with Joe Nasito, but at her deposition, she could not provide a basis for that belief other than that "it was a very small office and everyone talks." (*Id.* at 93.) Theresa Martin did not supervise Plaintiff, and the record does not indicate that her rudeness or intolerance of mistakes resulted in Plaintiff being disciplined.

As with the conduct of Larry Knorr and the rumor about Joe Nasito, Plaintiff complained to Brill about working with Theresa Martin. In fact, she did so on several occasions. (*See id.* at 73-75.) Plaintiff recalled with specificity during her deposition that Brill responded to her complaint in the same way as he did when Plaintiff brought the rumor to his attention and not like how he responded to the Larry Knorr incident. He became angry and told her that he "did not have time for this fucking nonsense, [and] to get the fuck out of his office." (*Id.* at 76.) This exchange was indicative of how Plaintiff's relationship with Brill worsened over her time at B&B Automotive. Some days he would praise her work, telling her she did a great job. (*See id.* at 109; Pl.'s Dep. Ex. 3 at fax page 20.) Others days he would be cold or rude to her, though he never disciplined her or gave her an unsatisfactory job evaluation. (*See* Pl.'s Dep. at 109.) The record indicates that he had a similarly tumultuous relationship with many employees. Indeed, Plaintiff believes that Brill "mentally assault[ed]" all of his employees. (*Id.* at 174.) Plaintiff's responses to an EEOC questionnaire contain an example involving Tim Roczey, who worked at B&B Automotive as a mechanic. (Pl.'s Dep. Ex. 3 at fax page 25.) Roczey resigned in September 2008 after a dispute with Brill. (*See* Pl.'s Dep. at 175.) On the day he resigned, he came to work to collect his belongings, and when Brill saw him, he became angry and yelled at him. Plaintiff witnessed this encounter, and she indicated that she had never seen "a more volatile reaction from

an employer. The anger he displayed was nothing less than rage, the language was nothing less than abusive." (Pl.'s Dep. Ex. 3 at fax page 25.) According to Plaintiff, she was "fearful for Tim but also for [herself]" because Brill knew she had attended a picnic at Roczey's house. (*See id.*)

In addition to calling her complaints about the rumors and Theresa Martin nonsense, Brill yelled at Plaintiff when another employee and Theresa Martin got in a fight and Plaintiff interceded. (*See* Pl.'s Dep. at 153-60.) The employee believed that Theresa Martin had been speaking unfavorably of her to Brill, and the employee became upset and unable to work because she was worried that she was going to lose her job. (*Id.* at 153-55.) The employee called Brill at home to discuss the matter with him, and after a conversation in which the employee began to cry, Brill hung up on her. (*Id.* at 157-58.) Another office phone rang moments later, and Plaintiff picked it up, saying "B&B Automotive, [Plaintiff] speaking, how may I help you?" (*Id.* at 158.) Brill was on the other end of the line, and as soon as Plaintiff stopped speaking, he yelled, "You motherfucking bitch," and told Plaintiff that if she wanted to keep her job, she should go back to her desk and work, otherwise, she could pack her "fucking shit up and leave." (*Id.* at 158-60.) The next day, Brill called Plaintiff into his office and asked why she was so glum. (*Id.* at 161.) She told him that she found his language of the previous day very offensive and that she had not had anything to do with the dispute.[1] (*Id.* at 161, 164.) He apologized to Plaintiff and told her that he was in the wrong and that he was working on his anger management. (*Id.* at 164.) He also told Plaintiff that Theresa Martin was a very valuable employee, that he would not tolerate crying in the office, and that anyone who cried would be fired. (*See id.* at 162-63, 169.)

---

[1] At her deposition, Plaintiff could point to only one example of Brill using derogatory language to refer to her, the incident where her called her a "motherfucking bitch." When asked, "What other names did [Brill] call you, and how often?" Plaintiff responded, "he told me I was emotionally unstable" and said no more. (Pl.'s Dep. at 77.)

Plaintiff's relationship with Brill deteriorated further in July 2008 when Brill became angry with Plaintiff several times in what Plaintiff believes was retaliation for her previous workplace complaints. That month, B&B Automotive was being audited, and an auditor discovered that a customer had relied on an expired driver's license in his contract with B&B Automotive, which meant that the transaction was faulty and the vehicle would have to be repossessed. (*See id.* at 78, 81, 145-46.) Frank Beyer had completed the contract on his own, but Brill blamed Plaintiff for the mistake. (*See id.* at 78, 146.) According to Plaintiff, Brill "came charging across the desk" at her; he was red in the face and screaming at Plaintiff from about six inches away. (*Id.* at 78-79.) For several weeks, until the truck was finally repossessed, Brill would ask Plaintiff, "Where is my truck at?" (*Id.* at 80, 191.) Brill took no disciplinary or other formal employment action against Plaintiff, such as giving her an unsatisfactory job evaluation, but he would "scream" at her and use "very hostile language." (*Id.* at 145.) He also told her that she was emotionally unstable. (*Id.* at 77.) The frequent questioning caused Plaintiff a great deal of stress, to the point where she would make herself vomit each morning. (*Id.* at 82.)

Plaintiff quit her job at B&B Automotive in September 2008 soon after Brill yelled at Tim Roczey. What happened on the day that she quit is unclear. It appears that Plaintiff and Brill were engaged in a dispute about B&B Automotive's obligation to repair a truck that Plaintiff had purchased from B&B Automotive. (*See id.* at 181, 193.) On September 15, 2008, Plaintiff's husband came to the car lot to bring her a sweater. (*Id.* 169-70.) When he was leaving, Plaintiff removed parts for the truck from B&B Automotive's garage and put them in her husband's car. (*Id.* at 170.) About an hour later, Brill "screamed [Plaintiff's] name over the loudspeaker," and Plaintiff went to his office, where he "screamed at [her] that he [had] not allow[ed] [her] to remove any parts from his building." (*Id.*) Brill "charged . . . across the desk" at Plaintiff.

8

Plaintiff was afraid she would be assaulted, and she fled the premises and called the police. (*Id.* at 171, 175.) When a police officer arrived, Plaintiff explained the situation to him, and he escorted her into B&B Automotive to collect her belongings. (*Id.* 177-78.) The police officer later filed a report, which states in pertinent part: "Complainant says that below male [Brill] wants the vehicle back that he sold to her. Complainant is concerned with receiving the rest of her pay check from business . . . . Complainant says she will contact her attorney today." (Pl.'s Dep. Ex. 6.) Plaintiff quit as a result of this incident, and she and B&B Automotive are currently litigating the dispute regarding the vehicle in state court. (*See* Pl.'s Dep. at 193.) Plaintiff maintains that the failure of the police report to mention that Plaintiff was afraid of being assaulted is a mistake. (*Id.* at 185.)

## II.    LEGAL STANDARD

A party is entitled to summary judgment when "the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the [party] is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c)(2); s*ee also Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247 (1986); *Fed. Home Loan Mortgage Corp. v. Scottsdale Ins. Co.*, 316 F.3d 431, 443 (3d Cir. 2003). Where the nonmoving party bears the burden of proof at trial, the moving party may identify an absence of a genuine issue of material fact by showing the court that there is no evidence in the record supporting the nonmoving party's case. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322, 325 (1986); *UPMC Health Sys. v. Metro. Life Ins. Co.*, 391 F.3d 497, 502 (3d Cir. 2004). If the moving party carries this initial burden, the nonmoving party must set forth specific facts showing that there is a genuine issue for trial. *See* Fed. R. Civ. P. 56(e)(2) (stating that "an opposing party may not rely merely on allegations or denials in its own pleading; rather, its response must . . . set out specific facts

showing a genuine issue for trial"); *see also Matsushita*, 475 U.S. at 587 (noting that the nonmoving party "must do more than simply show that there is some metaphysical doubt as to the material facts"). The nonmoving party may not avert summary judgment by relying on speculation or by rehashing the allegations in the pleadings. *Ridgewood Bd. of Educ. v. N.E. for M.E.*, 172 F.3d 238, 252 (3d Cir. 1999). "Where the record taken as a whole could not lead a reasonable trier of fact to find for the non-moving party, there is no 'genuine issue for trial.'" *Matsushita*, 475 U.S. at 587 (quoting *First Nat'l Bank v. Cities Serv. Co.*, 391 U.S. 253, 289 (1968)). When deciding a motion for summary judgment, courts must view facts and inferences in the light most favorable to the nonmoving party. *Anderson*, 477 U.S. at 255. Moreover, courts must not resolve factual disputes or make credibility determinations. *Siegel Transfer, Inc., v. Carrier Express, Inc.*, 54 F.3d 1125, 1127 (3d Cir. 1995).

## III.    ANALYSIS

Courts analyze Title VII gender discrimination and retaliation claims using the familiar burden-shifting framework established by the Supreme Court in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802-04 (1973). *See, e.g.*, *Scheidemantle v. Slippery Rock Univ. State Sys. of Higher Ed.*, 470 F.3d 535, 539 (3d Cir. 2006) (gender discrimination); *Moore v. City of Philadelphia*, 461 F.3d 331, 340-41 (3d Cir. 2006) (retaliation). Under this framework, the plaintiff must be able to establish a *prima facie* case of discrimination or retaliation. If the plaintiff establishes a *prima facie* case, the defendant must then produce a legitimate, nondiscriminatory explanation for the purportedly discriminatory conduct. If the defendant meets this burden of production, the plaintiff must show by a preponderance of the evidence that the defendant's proffered legitimate reason is merely a pretext for discriminatory conduct. Although this framework is well established, it is not "'intended to be rigid, mechanized, or ritualistic.'"

*Weldon v. Kraft*, 896 F.2d 793, 798 (3d Cir. 1990) (quoting *Furnco Constr. Corp. v. Waters*, 438 U.S. 567, 577 (1978)).

Some courts apply the *McDonnell Douglas* framework to hostile work environment claims while others do not. *See Brillhart v. Sharp*, No. 07-1121, 2008 U.S. Dist. LEXIS 55624, at *33-41 (M.D. Pa. July 21, 2008) (collecting cases supporting each approach). For the reasons articulated by the Sixth Circuit in *Pollard v. E.I. DuPont de Numours Co.*, we will follow the approach of the courts that do not apply the *McDonnell Douglas* framework:

> The McDonnell Douglas framework is meant to prove that conduct which might have some otherwise legitimate motive (such as promoting a man instead of a woman) was in fact based upon discriminatory motive. When a plaintiff proves that a hostile work environment existed, there is no legitimate justification for such an environment, and thus recourse to the McDonnell Douglas test is not warranted. A defendant's only option is to deny the charges or argue that defendant effectively remedied the situation, not to submit that the hostile environment was in some way warranted.

213 F.3d 933, 943 (6th Cir. 2000), *rev'd & remanded on other grounds by* 532 U.S. 843 (2001).

### A.    Hostile Work Environment

"[A] plaintiff may establish a violation of Title VII by proving that discrimination based on sex has created a hostile or abusive work environment." *Meritor Sav. Bank, FSB v. Vinson*, 477 U.S. 57, 66 (1986); *Oncale v. Sundowner Offshore Servs.*, 523 U.S. 75, 80 (1998); *Durham Life Ins. Co. v. Evans*, 166 F.3d 139, 148 (3d Cir. 1999). Title VII is not a general civility code, however, and does not guarantee employees a stress-free or pleasant work environment. *See Faragher v. City of Boca Raton*, 524 U.S. 775, 788 (1998); *Connors v. Chrysler Fin. Corp.*, 160 F.3d 971, 976 (3d Cir. 1998) (citing *Gray v. York Newspapers, Inc.*, 957 F.2d 1070, 1083 (3d Cir. 1992). To establish a hostile work environment based on sexual harassment, an employee must show that the conduct she experienced was so severe or pervasive that it amounted to a change in the terms and conditions of her employment. *Faragher*, 524 U.S. at 786-87. A plaintiff can do

so by showing that (1) she suffered intentional discrimination because of her sex;[2] (2) the discrimination was severe or pervasive; (3) it detrimentally affected her; (4) it would detrimentally affect a reasonable person in like circumstances; and (5) there is a basis for employer liability. *Huston v. Procter & Gamble Paper Prods. Corp.*, 568 F.3d 100, 104 (3d Cir. 2009); *see also Andreoli v. Gates*, 482 F.3d 641, 643 (3d Cir. 2007).

B&B Automotive argues that Plaintiff cannot establish that the conduct she experienced was severe or pervasive. Generally speaking, when evaluating a summary judgment challenge to a sexual-harassment-based hostile work environment claim, courts determine "whether an environment is 'hostile' or 'abusive'" by "looking at all the circumstances" surrounding the plaintiff's claim, including the "frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance." *See Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 23 (1993); *see also Andrews v. Philadelphia*, 895 F.2d 1469, 1482 (3d Cir. 1990) ("[A] decision regarding hostile work environment should be made viewing the totality of the circumstances . . . ."), *abrogated in part on other grounds by Burlington N. & Santa Fe Ry. Co. v. White*, 548 U.S. 53 (2006). Thus, in order to assess whether conduct was severe or pervasive, we must view the totality of the circumstances surrounding Plaintiff's claim. *See Harris*, 510 U.S. at 23; *Andrews*, 895 F.2d at 1484. Just as a "play cannot be understood on the basis of some of its scenes but only on its entire performance, . . . discrimination analysis must concentrate not on

---

[2] Although the terms "gender" and "sex" may have different meanings in some realms, the terms are used interchangeably for purposes of Title VII analysis. *Durham Life Ins. Co. v. Evans*, 166 F.3d 139, 148 (3d Cir. 1999) (observing that notwithstanding the fact that "'[g]ender' has often been used to distinguish socially- or culturally-based differences between men and women from biologically-based sex differences," the Third Circuit has "not considered 'sex' and 'gender' to be distinct concepts for Title VII purposes").

individual incidents, but on the overall scenario." *Andrews*, 895 F.2d at 1484. It is therefore improper to "disaggregate the various allegedly discriminatory acts and endeavors to cast doubt on each one . . . ." *Durham*, 166 F.3d at 149.

Plaintiff bases her claim on the following ten events that occurred over the four months that she worked at B&B Automotive: (1) Larry Knorr's comment to a customer that he could "swing both ways"; (2) the rumor that Plaintiff was sleeping with Joe Nasito; (3) Charlie's joke about the ice cream on Plaintiff's dress; (4) the comment by Frank Beyer's secretary about telling Beyer's wife that he and Plaintiff were "behind closed doors"; (5) Beyer's text message asking a coworker whether Plaintiff was wearing underwear; (6) Beyer's comment that high heels turned him on; (7) Tim Martin's suggestion to Plaintiff that she work for him because she was attractive; (8) Tim Martin's comment that he would hire Plaintiff's cousin if she was attractive and wore high heels; (9) Theresa Martin's general rudeness to Plaintiff; and (10) Michael Brill's conduct toward Plaintiff, including calling her a "motherfucking bitch" on one occasion, hounding her about a faulty transaction, and "charging" at her and yelling in her face on the day she quit. Viewing the record as a whole, it appears that some of the conduct that Plaintiff experienced was gender-based on its face while some was facially gender neutral. We consider facially neutral harassing conduct where, given the totality of the circumstances, it is apparent that the conduct is part of a wider set of harassment of an employee because of a protected trait. *See Durham*, 166 F.3d at 148 (observing that "facially neutral mistreatment plus the overt sex discrimination" can "constitute the hostile work environment" (citing *Aman*, 85 F.3d at 1083; *Andrews*, 895 F.3d at 1485)); *see also Cardenas v. Massey*, 269 F.3d 251, 261 (3d Cir. 2001) ("[T]he advent of more sophisticated and subtle forms of discrimination requires that we analyze the aggregate effect of all evidence and reasonable inferences therefrom, including those concerning incidents of facially

neutral mistreatment, in evaluating a hostile work environment claim." (citations omitted)). However, facially neutral harassing conduct that is clearly not associated with gender-based harassment is excluded from the hostile work environment analysis.

Plaintiff is correct in pointing out that some of the conduct she experienced appears to have been motivated by gender or gender distinctions generally: Charlie's joke about Plaintiff creaming her pants; Beyer's text message to a colleague asking whether Plaintiff was wearing underwear; Tim Martin's comments about Plaintiff's appearance and his willingness to hire Plaintiff's cousin if she was attractive; Theresa Martin's general rudeness; and Brill calling Plaintiff a "motherfucking bitch."

Other conduct may have been sexual in nature, but it was facially gender neutral; it may have had sexual connotations, but it was not targeted at Plaintiff *because* she was a woman. As the Supreme Court has recognized, it has "never held that workplace harassment, even harassment between men and women, is automatically discrimination because of sex merely because the words used have sexual content or connotations." *Oncale*, 523 U.S. at 80. The requirement that we consider the totality of the circumstances does not mean that when we are confronted with a series of isolated instances of inappropriate conduct, we must treat every facially neutral action by a coworker or supervisor that a plaintiff finds objectionable as having a basis in gender or being part of a hostile work environment. *See Faragher*, 524 U.S. at 788. Some facially neutral actions may constitute a part of the discriminatory harassment and some may not. And a series of unactionable, yet offensive, conduct cannot be rendered actionable by an unrelated, egregious incident that is not motivated by a protected trait like gender. At all times, "'[t]he critical issue'" that remains is "'whether members of one sex are exposed to disadvantageous terms or conditions of employment to which members of the other sex are not

exposed.'" *Oncale*, 523 U.S. at 80 (quoting *Harris*, 510 U.S. at 25 (Ginsburg, J., concurring)).

The first incident involving arguably sexual conduct that was otherwise gender neutral involved Larry Knorr asking a customer if she wanted to go dancing with him. This might have been unprofessional, but it is was not harassment of Plaintiff. The request was not directed at Plaintiff, and the only potentially offensive interpretation of Knorr's innuendo that he "sw[ung] both ways," is that he was attracted to both men and women. Why this would be more offensive or discriminatory to a woman than to a man is unclear, and Plaintiff does not offer an explanation. Nor does Plaintiff explain why the rumor about her and Nasito sleeping together can form the basis for a hostile work environment claim. It was just as insulting to Nasito as it was to Plaintiff. Employees who repeated the rumor were of both genders. More importantly, there is no evidence in the record that would support an inference that the rumor was started because of Plaintiff's gender.[3] *See Pasqua v. Metro. Life Ins. Co.*, 101 F.3d 514, 517 (7th Cir. 1996) (noting that rumors of intra-office affairs are often motivated by "a fascination with the prurient" that "ha[s] nothing to do with gender discrimination," and that such a rumor could not form the basis for the

------

[3] In the Complaint, Plaintiff alleges that Theresa Martin started the rumor. (Compl. ¶ 21.) Given Plaintiff's allegations that Theresa Martin did not like working with women, it is possible that Theresa Martin could have started the rumor because Plaintiff was a woman. However, Plaintiff has not argued this. Nor has she provided us with an affidavit or discovery materials from which the conclusion could reasonably be inferred. When asked at her deposition, "how do you know that Theresa Martin started a rumor that you were sleeping with Joe Nasito?" Plaintiff simply responded, "it was a very small office and everybody talks . . . ." (Pl.'s Dep. at 93.) At the summary judgment stage, Plaintiff cannot rely on her pleadings or ambiguous responses during a deposition to establish issues of fact that could have easily been established through an affidavit (or, perhaps, through reliance on discovery materials other than Plaintiff's deposition, which Plaintiff has not provided). The requirement that we draw all reasonable inferences in Plaintiff's favor does not require that we construe ambiguous statements in her favor and deploy them in arguments that she herself has not made. *See Henn v. Nat'l Geographic Soc.*, 819 F.2d 824, 830 (7th Cir. 1987) ("In passing on a motion for summary judgment, a court must indulge inferences in favor of the non-moving party, but it need not indulge all possible inferences."); *Gray*, 957 F.2d at 1082 (quoting *Henn*, 819 F.2d at 830).

plaintiff's hostile work environment claim); *see also Duncan v. Mgr., Dep't of Safety*, 397 F.3d 1300, 1311-13 (10th Cir. 2005) (expressing doubt that a rumor about the plaintiff and her superior being in a sexual relationship could substantiate the plaintiff's hostile work environment claim because the rumor critiqued both the plaintiff and her supervisor "rather than singling out [the plaintiff] on the basis of her gender" (citing *Pasqua*, 101 F.3d at 517)). The rumor was not, for example, based on "traditional negative stereotypes regarding the relationship between the advancement of women in the workplace and their sexual behavior . . . ." *See Spain v. Gallegos*, 26 F.3d 439, 448 (3d Cir. 1994). The same holds true for the secretary's comment about Plaintiff and Beyer being "behind closed doors." Nothing in the record indicates that this comment was directed at Plaintiff because she was a woman or that the secretary was implying that Plaintiff was exchanging sexual favors with Beyer in return for a promotion, job security, or the like.[4] Similarly, Beyer's comment that high heels turned him on is the sort of inappropriate yet ultimately innocuous conduct that Title VII does not cover. The comment was inane, but it was not an example of Plaintiff being treated differently because of her gender. Each of these gender-neutral incidents are the sort of minor indignities that are not actionable under Title VII. *See Oncale*, 523 U.S. at 81 (giving "male-on-male horseplay [and] intersexual flirtation" as examples of "ordinary socializing in the workplace," which cannot give rise to Title VII claims). Even

_____

[4] In her opposition, Plaintiff characterizes the secretary's comment as a rumor that Plaintiff was sleeping with Frank Beyer. (Doc. No. 27 at 8.) To support this assertion, she cites to the portion of her deposition transcript in which she describes the secretary's comment. After her description, Plaintiff added, "And I was told by Frank Beyer to just ignore the rumors." (Pl.'s Dep. at 127.) B&B Automotive's counsel then asked, "Were there rumors that you were having a relationship with Frank Beyer then, too?" (*Id.*) Plaintiff replied, "He just told me to ignore them." (*Id.*) B&B Automotive's counsel sought clarification, asking "What rumors are you referring to?" (*Id.*) Plaintiff clarified, "He told me to ignore the cattiness that was going on in the office." (*Id.*) This sequence of questioning does not indicate that there was a rumor that Plaintiff was sleeping with Beyer.

when viewed alongside the conduct that had a basis in Plaintiff's gender, these instances were not severe or pervasive.

The conduct that Plaintiff complains about was perpetrated by male and female employees alike. It was sporadic. And it did not involve touching of any kind, sustained insults to Plaintiff tied together by a theme or common intent to harass, or ongoing conduct by an employee or group of employees. *See Harris*, 510 U.S. at 23. With the exception of Theresa Martin's rudeness and the rumor about sleeping with Joe Nasito, all of the conduct consists of isolated incidents. Brill called Plaintiff a "motherfucking bitch" once; Larry Knorr made a potentially offensive comment in front of Plaintiff once; Charlie made a sexually explicit joke once; the secretary made an inappropriate comment about Plaintiff once; Beyer told Plaintiff once that high heels turned him on; he sent one inappropriate text message to a coworker about Plaintiff; Tim Martin told Plaintiff once that she should work for him because she was attractive; and he once told Plaintiff that he would hire her cousin if she were attractive and wore heels. This series of events amounts to a collection of "mere offensive utterence[s]" and occurrences that did not "unreasonably interfere[] with [Plaintiff's] work performance." *See id.* at 23. We do not condone this behavior. Indeed, it is all crass and unprofessional. Nevertheless, it is the sort of "sporadic use of abusive language, gender-related jokes, and occasional teasing" that the Supreme Court has identified as "the ordinary tribulations of the workplace" that are not actionable under Title VII. *See Faragher*, 524 U.S. at 788 (quotation marks and citation omitted); *see also Jensen v. Potter*, 435 F.3d 444, 451 (3d Cir. 2006) ("Occasional insults, teasing, or episodic instances of ridicule are not enough; they do not 'permeate' the workplace and change the very nature of the plaintiff's employment."). None of it, when taken alone or together, is so "extreme [as] to amount to a change in the terms and conditions of employment . . . ." *See Faragher*, 524 U.S. at 788.

In addition to being unrelated to Plaintiff's other complaints, the behavior that was arguably ongoing does not alter the analysis. Plaintiff relies a great deal on the conduct of Theresa Martin to oppose B&B Automotive's motion for summary judgment. However, Theresa Martin's conduct, as described by Plaintiff at her deposition, was general rudeness. (*See* Pl.'s Dep. at 64-70.) Martin would tell Plaintiff when Plaintiff made a mistake, and when Plaintiff would ask how to fix the problem, Martin would ignore her. Martin did not supervise Plaintiff, and she never arranged to have Plaintiff disciplined, prevented Plaintiff from doing her job, or influenced Plaintiff's job evaluations. Plaintiff bases her allegations that Martin did not get along with female employees on a rumor.[5] Indeed, Plaintiff identifies no conduct by Martin that, viewed alone or in the context of Plaintiff's other claims, would constitute sexual harassment (or gender-based animus) and form the basis for a hostile work environment claim. The same is true of the rumor about Plaintiff and Joe Nasito sleeping together. It was completely unrelated to the other conduct that Plaintiff found harassing, and, as discussed above, it was not the type of rumor that singled out Plaintiff because of her gender or limited her ability to effectively do her job.

Plaintiff's opposition papers attempt to bring Brill's general conduct into the totality of the circumstances, relying on what Plaintiff calls "the truck incident," in which he blamed her for an improperly documented transaction, and his conduct on the day she quit as sources of a hostile work environment resulting from sexual harassment. (*See* Doc. No. 27 at 13.) Viewed in the totality of the circumstances, this conduct was completely separate from the other conduct that

---

[5] At her deposition, Plaintiff promised that "I will bring every woman [who worked at B&B Automotive] to testify that they were all treated the same way by this woman"—Theresa Martin—"and we all complained to Mike Brill about her." (Pl.'s Dep. at 73.) Despite having ample time to conduct discovery and prepare her opposition to B&B Automotitve's motion for summary judgment, Plaintiff has offered no discovery or disclosure materials or any affidavits to support her position. Other than Plaintiff's statement, there is no indication that other female employees would support Plaintiff's allegations about Theresa Martin.

Plaintiff complained of and was not motivated by Plaintiff's gender. It cannot be reasonably viewed as related to the conduct that Plaintiff believes to be sexual harassment.

On their face, these two incidents have nothing to do with sex or Plaintiff's gender. Both incidents have clear, non-sexual and non-gender based explanations in the record. The truck incident arose in July 2008, when B&B Automotive was being audited and an auditor found a transaction that was not properly documented. The faulty transaction prompted Brill to fly into a rage and blame Plaintiff for the mistake, at one point yelling at her about six inches from her face. (*See* Pl.'s Dep. at 79.) At her deposition, Plaintiff said that she tried to explain to Brill that she was not responsible for the transaction, but he "would not listen." (*Id.* at 80.) For several days, Brill would harass Plaintiff about the transaction, asking her daily "[w]here is my truck at?" (*Id.*) However, once B&B Automotive recovered the truck, the harassment stopped. (*See id.* at 191.) It seems clear that Brill's conduct was motivated by his frustration with the faulty transaction, even though his belief that Plaintiff was responsible for the transaction may have been erroneous. Plaintiff has submitted nothing that contradicts this or that suggests that Brill feigned an erroneous belief to use as cover to harass Plaintiff because she was a woman. Furthermore, while Brill yelled at Plaintiff and persisted in asking her about the truck, he never formally disciplined her (e.g., by docking her pay or changing her duties). (*Id.* at 144-45.) In sum, there is nothing that indicates that Plaintiff's gender had anything to do with the incident.

On the day Plaintiff quit, Brill yelled at her for removing parts from B&B Automotive to repair a truck that she had purchased there. Plaintiff alleges that he became enraged and "charged" at her and that she was so frightened by him that she called the police. It is interesting that the police report makes no mention of Brill's conduct or Plaintiff's fear for her safety. (Pl.'s Dep. Ex. 6.) Rather, it describes a dispute between Plaintiff and Brill over the truck that Plaintiff

purchased from B&B Automotive.[6]  (*See id.*)  The dispute over the truck's maintenance is real, and Plaintiff and B&B Automotive are currently litigating the matter in state court.  While it is entirely reasonable to view Brill's outburst as connected to the dispute over the truck, there is simply nothing in the record that could support the conclusion that Brill's conduct on that day was motivated by Plaintiff's gender.

Moreover, there is ample support in the record, including Plaintiff's own characterization of working at B&B Automotive, that suggests that Brill was temperamental and given to explosive outbursts at all employees, regardless of gender.  At her deposition, Plaintiff stated that Brill "mentally assault[ed] all of us"—male and female employees alike.  (*See id.* at 174.) Plaintiff noted that Tim Roczey, the mechanic, and a service manager quit because of the "hostile work environment."  (*See id*. at 175.)  Roczey's experience is telling.  On Roczey's last day, Brill treated him almost the same as Brill treated Plaintiff on her last day.  After Roczey quit, he came by the car lot to pick up his belongings.  When Brill saw Roczey, he flew into a rage and used abusive language, just as he later did with Plaintiff, and was so aggressive that Plaintiff was fearful for Roczey, just as she was fearful for herself on the day she quit.  (*See* Pl.'s Dep. Ex. 3 at fax page 25.)  This evidence indicates that Brill treated all his employees poorly and did not single out women.  Such conduct, although it may make for an abusive work environment, is not

---

[6] When confronted at her deposition with the police report's failure to mention an assault claim, Plaintiff asserted that the police officer had failed to include it in his report.  (Pl.'s Dep. 179-85.)  However, the police officer did note that Plaintiff was "concerned with receiving the rest of her pay check from [the] business."  (Pl.'s Dep. Ex. 6.)  We note that Plaintiff did offer to have the report revised and to subpoena the transcript of her 911 call.  (*Id.* at 185.)  She did not do so.  Her bald assertion that a document prepared by a police officer is erroneous is not sufficient to create a genuine issue of material fact.  *Cf. Kirleis v. Dickie, McCamey & Chilcote, P.C.*, 560 F.3d 156, 161 (3d Cir. 2009) ("'[C]onclusory, self-serving affidavits are insufficient to withstand a motion for summary judgment.'"  (quoting *Blair v. Scott Specialty Gases*, 283 F.3d 595, 608 (3d Cir. 2002))).  In any event, even if we were to accept Plaintiff's telling of the events, the same outcome would obtain.

actionable under Title VII because it is not based on a protected trait. *See Jensen*, 435 F.3d at 449 ("Many may suffer severe or pervasive harassment at work, but if the reason for that harassment is one that is not proscribed by Title VII, it follows that Title VII provides no relief."); *Hubbell v. World Kitchen, LLC*, 688 F. Supp. 2d 401, 419 (W.D. Pa. 2010) ("[A]n employer which indiscriminately subjects its employees to a hostile work environment commits no violation of Title VII . . . .").

It is significant that in her opposition papers, Plaintiff has listed both the truck incident and her experience on her last day as support for her hostile work environment claim. (*See* Doc. No. 27 at 13.) However, at her deposition, Plaintiff expressly disavowed her experience on her last day as a basis for her hostile work environment claim, instead characterizing it as retaliation for her earlier complaints about sexual harassment. (*See* Pl.'s Dep. at 48-50, 193.) In addition, Plaintiff characterized Brill's conduct surrounding the audit and faulty truck transaction as retaliation, not sexual harassment. (*See id.* at 82, 187.) In most situations, when an employee has been harassed, reports that harassment, and continues to be harassed after she makes the report, courts will leave the issue to the jury to decide wether the post-complaint harassment was motivated by gender animus or retaliatory animus. *See Jensen*, 435 F.3d at 454 ("[W]hen a woman who complains about sexual harassment is thereafter subjected to harassment based on that complaint, a claim that the harassment constituted sex discrimination . . . will almost always present a question that must be presented to the trier of fact."); *Clegg v. Falcon Plastics Inc.*, 174 F. App'x 18, 25 (3d Cir. 2006) (non-precedential) ("[T]the motivation behind . . . post-reporting conduct is a question best left to the jury to decide."). However, where an employee draws a bright-line distinction between the sexually harassing conduct and the retaliatory conduct, and where the harassing conduct and the retaliatory conduct are of a qualitatively different nature, the

employee cannot use the retaliatory conduct to fill in for an absence of evidence of sexual

harassment in order to survive a summary judgment challenge. *See Berry v. Delta Airlines, Inc.*,

260 F.3d 803, 808-10 (7th Cir. 2001) (observing that "[w]hile it is true that the claimed campaign

of post-complaint harassment was apparently conducted in response to [the plaintiff's] sexual

harassment complaint, . . . this does not impute a gender basis to the post-complaint harassment"

and that to hold otherwise "would force us to conclude that every claim of retaliation for filing

charges of discrimination would be a claim of discrimination, even thought [sic] Title VII makes

discrimination and retaliation separate wrongs" (quotation marks and citation omitted)). It seems

clear that Plaintiff based her lawsuit on these instances constituting retaliation.[7] She cannot now,

at summary judgment, use them to strengthen an inadequately supported sexual harassment claim.

Plaintiff has pointed to nothing in the record that creates a factual dispute regarding the

truck incident or the conduct on the day she quit. Moreover, the other conduct that Plaintiff

complains of is not sufficient to establish an abusive or hostile work environment. Accordingly,

B&B Automotive is entitled to summary judgment. From this conclusion, it follows that

Plaintiff's theory of constructive discharge, which is based on her sexual harassment claim, also

fails. To establish a constructive discharge claim, a plaintiff must first establish the existence of a

hostile work environment. *See Pa. State Police v. Suders*, 542 U.S. 129, 149 (2004) ("Creation

of a hostile work environment is a necessary predicate to a hostile-environment constructive

discharge case."); *see also id.* at 147 ("A hostile-environment constructive discharge claim entails

something more [than a hostile work environment claim]: working conditions so intolerable that

---

[7] As we discuss *infra*, Plaintiff's attempt to invoke the truck incident and the day she quit as support for her retaliation theory is flawed for the same reason that we reject them as support for her sexual harassment claim. The record is clear that Brill was harsh to all his employees, and not harsher to women than men. The record does not support the conclusion that the conduct was based on gender animus or retaliatory animus.

a reasonable person would have felt compelled to resign.").  Since Plaintiff has not done so here,

B&B Automotive is entitled to summary judgment on Plaintiff's theory of constructive discharge.

### B.    Gender Discrimination

Title VII prohibits employers from discriminating against employees on the basis of

gender.  42 U.S.C. § 2000e-2(a).  In order to establish a *prima facie* case of gender

discrimination, a plaintiff must demonstrate that (1) she was a member of a protected class;

(2) she performed her job satisfactorily; (3) she suffered adverse employment action; and (4) her

employer treated similarly-situated male colleagues more favorably.  *See Jones v. School Dist. of

Phila.*, 198 F.3d 403, 411 (3d Cir. 1999).  These elements are not strict categories that precisely

define what a plaintiff must show; rather, they are meant to provide structure to our inquiry into

whether a plaintiff "suffered some form of 'adverse employment action' sufficient to evoke the

protection of Title VII . . . ."  *See id.*  (explaining that "the elements of a prima facie case depend

on the facts of the particular case" and that "a prima facie case cannot be established on a

one-size-fits-all basis" (citations omitted)); *see also Doe v. C.A.R.S. Prot. Plus*, *Inc.*, 527 F.3d

358, 365 (3d Cir. 2008) ("A *prima facie* case cannot be established on a one-size-fits-all basis.").

Plaintiff's gender discrimination claim has two defects, either of which is sufficient to

preclude her from establishing a *prima facie* case.  First, to the extent that her claim differs from

her hostile work environment claim, it is almost entirely premised on the conduct of Theresa

Martin.  (*See* Doc. No. 27 at 18.)  As discussed above, Theresa Martin may have been rude to

Plaintiff, but her conduct did not amount to discrimination. Theresa Martin did not supervise

Plaintiff.  Nor did she ever do anything to Plaintiff that would amount to a change in the terms or

conditions of her employment.  Plaintiff relies on her argument that she was constructively

discharged to satisfy the adverse employment action requirement.  Our discussion of the truck

incident and Plaintiff's last day makes it clear that her decision to quit as a result of Brill's

conduct had nothing to do with her gender or her complaints about the unprofessional conduct of

her coworkers.  It was a result of Brill's outbursts and a dispute over the purchase of a truck.

Second, Plaintiff cannot show that B&B Automotive or Brill treated similarly-situated male

colleagues more favorably.  The Tim Roczey incident indicates that male employees were subject

to the same type of treatment that Plaintiff experienced both on her last day and as a result of the

truck incident.  Plaintiff has pointed to nothing in the record that could support the conclusion

that her experience was any different from that of B&B Automotive's other employees, male or

female.  Accordingly, B&B Automotive is entitled to summary judgment on Plaintiff's gender

discrimination claim.

### C. Retaliation

Title VII makes it unlawful for employers to retaliate against an employee for opposing

the employer's discriminatory conduct or for bringing or supporting an action arising from the

employer's discriminatory conduct.  42 U.S.C. § 2000e-3(a).  To establish a *prima facie* case of

retaliation, a plaintiff must show that (1) she engaged in protected conduct; (2) her employer took

a materially adverse employment action against her; and (3) there was a causal connection

between her participation in the protected activity and the adverse employment action.  *Moore*,

461 F.3d at 340-41.  An employee engages in a protected activity when she notifies management

with sufficient clarity that discrimination prohibited by Title VII is occurring in the workplace.

*See Barber v. CSX Distrib. Servs.*, 68 F.3d 694, 702 (3d Cir. 1995).  The employee need not be

correct that discriminatory conduct is taking place; rather, the employee "must hold an objectively

reasonable belief, in good faith, that the activity [she] oppose[s] is unlawful under Title VII."

*Moore*, 461 F.3d at 341 (citing *Clark County v. Breeden*, 532 U.S. 268, 271 (2001) (per curiam));

*see also Aman*, 85 F.3d at 1085.  In order to satisfy the second element, "a plaintiff must show that a reasonable employee would have found the challenged action materially adverse, which . . . means it well might have dissuaded a reasonable worker from making or supporting a charge of discrimination." *Burlington N. & Santa Fe Ry. Co. v. White*, 548 U.S. 53, 64 (2006) (quotation marks and citation omitted).  The third element requires a plaintiff to "show a causal connection between the plaintiff's opposition to, or participation in proceedings against, unlawful discrimination and an action that might have dissuaded a reasonable worker from making or supporting a charge of discrimination." *Moore*, 461 F.3d at 341-42.

Plaintiff complained to Brill and Beyer on several occasions regarding conduct that she found unprofessional and offensive.  (*See, e.g.*, Pl.'s Dep. at 76, 88, 99, 112.)  At least one of these complaints constituted protected activity.  Plaintiff was informing her bosses about workplace activities that she genuinely, in good faith, believed were sexual harassment and gender-based discrimination.  *See Aman*, 85 F.3d at 1085 ("'[A] plaintiff need not prove the merits of the underlying discrimination complaint, but only that he was acting under a good faith, reasonable belief that a violation existed.'"  (quoting *Griffiths v. Cigna Corp.*, 988 F.2d 457, 468 (3d Cir. 1993))).  It is therefore of no moment that the incidents she complained of, individually or collectively, did not rise to the level of a hostile work environment or gender discrimination.

Questions of fact may exist regarding whether the truck incident and Brill's conduct on the day Plaintiff quit amounted to adverse employment action, but we need not reach the issue because there is no causal relationship between those events and the protected activity, thereby preventing Plaintiff from establishing a *prima facie* case.[8]  Courts determine whether there is a

_____

[8] In her opposition papers, Plaintiff relies entirely on the truck incident and her experience on the day she quit to establish the adverse employment action requirement of her retaliation claim.  (*See* Doc. No. 27 at 22.)  Those incidents were not causally related to Plaintiff's protected

25

causal connection by examining "the record as a whole . . . ." *Farrell v. Planters Lifesavers Co.*, 206 F.3d 271, 281 (3d Cir. 2000). Considerations like the temporal proximity of the alleged retaliatory conduct to the protected activity, evidence of ongoing antagonism, and the apparent invalidity of explanations for the alleged retaliatory conduct are useful areas of inquiry, though they are by no means the only areas. *See Abramson v. William Paterson Coll. of N.J.*, 260 F.3d 265, 288-89 (3d Cir. 2001).

Plaintiff's opposition brief contains no substantive support for her contention that the truck incident and Brill's conduct on the day Plaintiff quit were retaliation for Plaintiff making complaints about sexual harassment and gender discrimination. (*See* Doc. No. 27 at 22.) She merely argues that, "[a]t her deposition, . . . Plaintiff testified that Mr. Brill's conduct in this regard was clearly retaliation for her complaints to him of sexual harassment and gender discrimination." (*Id.*) The most apparent problem with this line of argumentation is that it is circular: it offers no evidence, direct or circumstantial, from which causation can be established. *See, e.g.*, *Stroud v. New York City*, 374 F. Supp. 2d 341, 351 (S.D.N.Y. 2005) (treating the plaintiff's unsubstantiated claim that she was treated differently than other employees because she engaged in protected conduct as "ipse dixit [that] is insufficient to defeat a motion for

---

activity. However, even if we expand our inquiry to include Brill's actions immediately following Plaintiff's complaints—calling Plaintiff's complaints "fucking nonsense" and telling her to "get the fuck out of his office" (*see, e.g.*, Pl.'s Dep. at 51)—the conduct does not amount to an adverse employment action. *See, e.g.*, *Stephens v. Erickson*, 569 F.3d 779, 790 (7th Cir. 2009) (agreeing with trial court that a supervisor's physically segregating the plaintiff and "intimidat[ing] him by staring and yelling at him . . . were not materially adverse actions"); *Baloch v. Kempthorne*, 550 F.3d 1191, 1199 (D.C. Cir. 2008) ("[S]poradic verbal altercations or disagreements do not qualify as adverse actions for purposes of retaliation claims . . . ."); *Nagle v. Risk Mgmt. Ass'n*, 513 F. Supp. 2d 383, 290-92 (E.D. Pa. 2007) (holding that the plaintiff's claim that she was "harassed, insulted and threatened with loss of her employment" during a 65 minute meeting after she had made a discrimination complaint did not amount to an adverse employment action).

summary judgment"). This is fatal to her claim because the causation inquiry is inherently fact-intensive. *See Farrell*, 206 F.3d at 280-82 (stating that "each case must be considered with a careful eye to the *specific facts and circumstances* encountered" (emphasis added)). Without facts, there is no way to establish causation. Plaintiff's statement at her deposition that "I felt that [the truck incident] was retaliation" for "going to him complaining about sexual harassment and gender [discrimination]" is not a fact. (*See* Pl.'s Dep. at 82.) It is an opinion, and Plaintiff's opinion of her experience does not create a genuine issue of fact about her case. Plaintiff never explains why she felt that way, for instance, by identifying conduct in addition to the facially neutral underlying conduct that led her to believe that Brill was retaliating against her.

Plaintiff worked for such a short period of time, and complained so frequently, that temporal proximity, which courts often use to inform their causation analyses, *see, e.g.*, *Farrell*, 206 F.3d at 280-81, is of little use here. Indeed, Plaintiff first complained about Larry Knorr shortly after she started working on May 5, 2008. The truck incident unfolded over a period of time in July 2008. (Pl.'s Dep. at 143-44.) But since Plaintiff complained often—at her deposition, she stated that "I constantly went into [Brill] and Frank Beyer about things that were said that were unappropriate [sic] in a business setting" (*id.* at 83)—it is difficult to link her participation in a protected activity to the truck incident solely on temporal proximity grounds. At the rate Plaintiff complained, any adverse employment action, no matter how justified, would be causally linked to her protected activity, if we were to rely solely on temporal proximity. Instead, we look to the record as a whole, and we find nothing suggestive of a causal link. In fact, there is substantial evidence tending to show that there was no causal link at all. Brill treated other employees like he treated Plaintiff. He did not single Plaintiff out for harsh treatment. It appears that he never said anything to Plaintiff about her complaints after she made

them. He simply ignored them. Finally, once the truck with faulty documentation was repossessed, Brill ceased harassing Plaintiff and took no formal employment action against her.

The same is true of Brill's conduct on September 15, 2008, the day Plaintiff quit. Although Plaintiff complained regularly, it is not clear how close her final complaint was to the day she quit, and Plaintiff has provided no indication of the temporal proximity. Thus, there is not even a weak basis for causation with regard to this incident. Moreover, nothing in the record, other than Plaintiff's feelings (*see* Pl.'s Dep. at 48), suggests any causal connection between the protected activity and Brill's conduct. There was a dispute between Plaintiff and Brill about a truck that she purchased. Plaintiff removed parts from B&B Automotive, which angered Brill. He flew into a rage, very similar to the rage he flew into against Tim Roczey, and yelled at Plaintiff. That dispute is now being litigated in state court.

Because Plaintiff cannot establish the third element of a *prima facie* case of retaliation, B&B Automotive is entitled to summary judgment.

## IV.    CONCLUSION

If we accept Plaintiff's testimony as true, which we must, our conclusion that B&B Automotive is entitled to summary judgment is certainly not an endorsement of the work environment that Plaintiff describes. No worker would want to experience the tasteless jokes or petty office politics at B&B Automotive. However, the bulk of the incidents that Plaintiff complains of were minor indecencies. The driving force behind the incivility in the workplace, as described by Plaintiff, was a temperamental manager who treated all his employees poorly. The most significant events of which Plaintiff complains were examples of Brill's unchecked and irrational anger. They were not examples of gender-based harassment or animus. Indeed, the record contains examples of Brill treating male employees the same way he treated Plaintiff.

Ultimately, there is no question of fact regarding "[t]he critical issue" of "whether members of one sex [were] exposed to disadvantageous terms or conditions of employment to which members of the other sex [were] not exposed."  *See Oncale*, 523 U.S. at 80 (quotation marks and citation omitted).  B&B Automotive is therefore entitled to summary judgment, despite the unpleasant work environment it provided to its employees.

      An appropriate Order follows.

BY THE COURT:

_____
R. Barclay Surrick, Judge